IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JOSEPH HAYWARD,                     )
                                    )
            Plaintiff,              )
                                    )
      v.                            )      1:13cv597 (LMB/TRJ)
                                    )
CAROLYN W. COLVIN,                  )
      Acting Commissioner,          )
      Social Security Administration, )
                                    )
            Defendant.              )

## MEMORANDUM OPINION

Plaintiff Joseph Hayward ("plaintiff" or "Hayward") has brought this civil action against

defendant Carolyn W. Colvin ("defendant" or "Commissioner"), the Acting Commissioner of the

Social Security Administration ("SSA"), seeking review of the Commissioner's decision denying

plaintiff disability benefits. Before the Court are the parties' cross-motions for summary

judgment, as well as plaintiff's objections to the magistrate judge's Report and Recommendation

("Report"), which recommended that summary judgment be granted in favor of defendant.

For the reasons that follow, the Court declines to adopt the Report's recommendation.

Accordingly, plaintiff's motion will be granted, defendant's motion will be denied, the

Commissioner's denial of benefits will be vacated, and the matter will be remanded to the SSA

for further fact-finding.

## I.  BACKGROUND

### A. **Procedural History**

On January 28, 2010,[1] Hayward protectively filed for disability insurance benefits,

alleging disability beginning May 15, 2009, due to injuries to his right wrist, left elbow, and left

thumb. R.[2] at 16, 180, 184.  Hayward's claim was denied initially on April 19, 2010, and upon

reconsideration on January 21, 2011.  R. at 75-76, 88.  Hayward requested a hearing before an

Administrative Law Judge ("ALJ"), which was held on January 18, 2012.  R. at 30, 107.

Following the hearing, the ALJ issued a decision on March 2, 2012, finding that Hayward

was not disabled within the meaning of the Social Security Act and denying his benefits claim.

R. at 13-25.  On March 18, 2013, the SSA's Appeals Council denied Hayward's request for

review of the ALJ's decision, thereby making the ALJ's decision the final decision of the

Commissioner.  R. at 1-3, 12.  Plaintiff timely filed the instant complaint seeking review of the

Commissioner's decision.  Thereafter, the parties submitted cross-motions for summary

judgment and a magistrate judge issued the Report on May 8, 2014, recommending summary

judgment be granted in favor of defendant.  Hayward timely filed an objection to the Report and

defendant filed an opposition to that objection.

### B. **Factual Background**

Hayward's medical records establish a long history of extensive problems with his

elbows and right wrist, beginning in June 2007 when he injured his right wrist while working as

a master deputy sheriff in Fairfax County.  R. at 184, 186, 505, 541.  Hayward held this position

---

[1] The briefs of both parties, as well as plaintiff's Application Summary for Disability Benefits, state that plaintiff filed for disability on February 18, 2010; however, both of the Commissioner's denials of plaintiff's disability application, as well as the decision of the Administrative Law Judge, state that plaintiff filed on January 28, 2010.

[2] "R." refers to the administrative record.

from November 1991 until May 15, 2009, his alleged onset date; however, he was moved to a

light duty position in a control booth following his initial wrist injury. R. at 42-44, 71, 186.

Thereafter, Hayward went on almost a year of administrative leave, after which he worked one

12-hour week in an administrative capacity putting warrants together before medically retiring in

May 2010.[3] R. at 42-43, 178.

Hayward first underwent conservative treatment for the injury to his right wrist, which

consisted of taking anti-inflammatories, receiving cortisone injections, and wearing a splint. R.

at 373. On June 13, 2008, after conservative treatment had failed, Hayward's treating physician,

Dr. Kostas Constantine ("Dr. Constantine"), performed a right wrist arthroscopy with triangular

fibrocartilage complex ("TFCC") debridement and partial synovectomy. R. at 373. Following

this surgery, Hayward continued to have difficulty with his right wrist, and an MRI performed on

February 5, 2009, revealed another TFCC tear. R. at 312, 348; see, e.g., R. at 505 (April 13,

2010, status report of Dr. Constantine noting the continued existence of a ligament tear in

Hayward's right wrist); R. at 487 (July 13, 2010, status report of Dr. Constantine referring to

---

[3] Confusingly, the ALJ's decision initially acknowledges that Hayward's earnings beginning in mid-2009 were paid administrative and sick leave and that he had "not engaged in substantial gainful activity since his alleged onset date of May 15, 2009." R. at 18. But later in her decision, the ALJ incorrectly states that Hayward "continued to work a year after his alleged onset date, performing in an administrative capacity at the sheriff's office until May 2010." R. at 22.
Hayward, however, testified that he was put "on administrative leave for almost year" starting in 2009, which lasted until he was medically retired in May 2010, with the exception of one day towards the end of that time period in which he came off of leave to attempt an administrative job. R. at 42-43. Hayward's earnings history confirms that he was on administrative leave from mid-2009 until May 2010 and that he only worked one day in April 2010. R. at 157-79.
The Report similarly misstated that Hayward "did administrative work including work at a control booth until 2010, almost a year after his alleged onset date." Report and Recommendation 4. In contrast, Hayward testified that he worked in an administrative capacity in the control booth from the time of his initial injury in June 2007 until he went on administrative leave in mid-2009. R. at 42-44. On remand, the ALJ should correct the record and consider this fact when reevaluating her decision.

Hayward's "chronic TFCC ligament tear" in his right wrist, which "did not go back to normal after the surgery"); R. at 574 (March 22, 2011, status report of Dr. Constantine stating that Hayward "still has the chronic pain" in his right wrist); R. at 615 (August 30, 2011, status report of Dr. Constantine commenting that "the chronic TFCC tear" in his right wrist "is still symptomatic").

Hayward's right wrist injury caused him to overuse his left arm and hand and, in January 2009, his left elbow became painful. R. at 312. From June through August 2009, Hayward received a series of four cortisone injections from his treating physician, Dr. Constantine, to treat the left elbow pain. R. at 319-21. After the injections, anti-inflammatories, and splinting failed to relieve Hayward's pain, an MRI on November 30, 2009, confirmed that Hayward had developed lateral epicondylitis[4] in his left elbow. R. at 275, 312, 318, 321, 323, 412. On January 20, 2010, Hayward underwent a left lateral epicondylar release with stripping.[5] R. at 275-76. Following this surgery, Hayward's left elbow seemed to improve for a time. E.g., R. at 571 (November 30, 2010, status report of Dr. Constantine indicating that there had been improvement in the left elbow).

Unfortunately, Hayward overused his right arm while his left elbow was recovering from the surgery and, consequently, he developed lateral epicondylitis in his right elbow by July 2010.

---

[4] Lateral epicondylitis, commonly known as "tennis elbow," "is a painful condition of the elbow caused by overuse." Am. Acad. of Orthopedic Surgeons, Tennis Elbow (Lateral Epicondylitis), OrthoInfo, http://orthoinfo.aaos.org/topic.cfm?topic=A00068 (last updated Oct. 2, 2014). Specifically, "[t]ennis elbow is an inflammation of the tendons that join the forearm muscles on the outside of the elbow. The forearm muscles and tendons become damaged from overuse—repeating the same motions again and again. This leads to pain and tenderness on the outside of the elbow." Id.

[5] This procedure entails cutting the inflamed tendon where it connects to the lateral epicondyle (bony bump at the bottom of the humerus on the outside of the elbow) and removing any extra scar tissue and bone spurs. See id.; Med. Multimedia Grp., LLC, Tennis Elbow, eOrthopod, http://www.eorthopod.com/tennis-elbow/topic/23 (last visited Nov. 17, 2014). The result is to take tension off the tendon. Id.

R. at 487. On September 20, 2010, an MRI of Hayward's right elbow confirmed he had an intermediate grade tear at the origin of the common extensor tendon from the lateral humeral condyle, as well as radial bicipital bursitis, tenosynovitis, and tendinopathy of the distal biceps tendon with a low grade partial thickness tear. R. at 492, 512-13. Hayward received two cortisone injections in his right elbow in October and November 2010 to treat the pain caused by the lateral epicondylitis. R. at 492, 571. In his March 22, 2011, status report, Dr. Constantine acknowledged that Hayward's right lateral epicondyle was still torn and may require surgery. R. at 574.

In January 2011, the progress Hayward's left elbow had made reversed course and the elbow became more inflamed, swollen, and tender. R. at 572. Dr. Constantine gave Hayward a cortisone injection, which did "not make much difference." R. at 572-73. Results of an MRI scan of Hayward's left elbow on March 10, 2011, were interpreted to suggest the "presence of lateral epicondylitis" and a ligament sprain, both of which were "probably chronic in nature." R. at 600. After his left elbow continued to deteriorate, Hayward underwent his third surgery, a revision lateral epicondylar release with stripping and an anconeus muscle transfer, on April 29, 2011. R. at 587-88 (indicating that, while performing the surgery, Dr. Constantine had found that a muscle had re-torn). In November 2011, Dr. Constantine observed that Hayward's left elbow "still has a moderate amount of discomfort with some stiffness and pain" but that it had a "reasonably good range of motion." R. at 612. He concluded that Hayward's left elbow was at maximum medical improvement, although it was "not back to normal," and that it would likely be permanently impaired. R. at 612.

By June 2011, Dr. Constantine was convinced that Hayward's right elbow, which was still torn and causing him pain, required lateral epicondyle release surgery. R. at 617 ("There is

5

no question he has a medical necessity for this [procedure] since it has failed all conservative treatment and has an MRI that documents the injury."). In November 2011, Dr. Constantine recommended that Hayward undergo an anconeus muscle transfer with the right lateral epicondyle release, given that this dual procedure had produced better results in Hayward's left elbow than had the release surgery alone the first time around. R. at 612. In the same report, Dr. Constantine also reiterated his recommendation that Hayward undergo an ulnar-shortening osteotomy to relieve the chronic TFCC tear in his right wrist. R. at 612 ("I have been telling him all along I would recommend an ulnar-shortening osteotomy, but we could not get it okayed."). In December 2011, Dr. Constantine again recommended an osteotomy of Hayward's right ulna to address his ongoing right wrist problems and a lateral epicondyle release with an anconeus muscle transfer for his right elbow. R. at 629.

   To manage the above conditions, Hayward has been on a regimen of chronic pain medications since mid-2009. R. at 305, 324, 575, 616. These medications include Percocet and methadone, both of which are Schedule II narcotics,[6] for pain; Ambien to help sleep through the pain; Lyrica for nerve pain; meloxicam, an anti-inflammatory; and Flector Patches, which are anti-inflammatory prescription patches. R. at 188, 215, 221, 235, 240, 250, 258, 278, 305, 625. At the hearing in January 2012, Hayward testified that he was starting OxyContin, also a Schedule II narcotic, that day. R. at 47. These and other medications that Hayward takes multiple times per day cause him myriad side effects, including concentration and memory trouble, drowsiness, and irritability. R. at 50, 210, 215, 221, 230, 235, 240, 247, 255. Although the medications help manage the pain, they do not completely eradicate it. R. at 46-48, 215, 235.

---

[6] Drug Enforcement Agency, U.S. Dep't of Justice, Drugs of Abuse 19 (2011), available at http://www.dea.gov/pr/multimedia-library/publications/drug_of_abuse.pdf.

## C. ALJ Decision

After Hayward's disability claim was denied initially and upon reconsideration, a hearing was held before ALJ Maria Alexander Nunez on January 18, 2012. At the hearing, Hayward, who was represented by counsel, and Patricia Verser,[7] an impartial vocational expert, testified. R. at 30-31, 107. In a decision issued six weeks later, the ALJ found that Hayward was not disabled within the meaning of the Social Security Act from his alleged onset date of May 15, 2009, through the date of the decision. R. at 13-25. As an initial matter, the ALJ found that Hayward met the insured status requirement through December 31, 2015. Then, applying the five-step sequential evaluation process prescribed by 20 C.F.R. § 404.1520(a)(4), the ALJ found that Hayward: (1) had not engaged in substantial gainful activity since his alleged onset date; (2) had severe impairments consisting of left lateral epicondylitis and tendinopathy, right lateral epicondylitis with a history of right wrist fibrocartilage tear, and obesity; (3) did not have a severe impairment that qualified as or equated to an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) could not perform any of his past relevant work; but (5) could perform certain jobs that existed in significant numbers in the national economy, namely usher, sandwich board carrier, and parking lot attendant. R. at 18-24. The ALJ based her findings regarding Hayward's employment capabilities on her assessment that he retained the residual functional capacity ("RFC") to perform "light work" as defined in 20 C.F.R. § 404.1567(b),[8]

---

[7] Although the hearing transcript refers to the vocational expert as "Patricia Burser," e.g., R. at 32, the record indicates that her last name is "Verser." R. at 124, 127-28.

[8] This section provides:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these

except that he was "limited to work requiring no climbing of ropes/ladders/scaffolding on more than an occasional basis, with no more than occasional pushing/pulling with the bilateral upper extremities." R. at 19-20. Additionally, the ALJ found that although Hayward's impairments could reasonably be expected to cause his alleged symptoms, his descriptions of the intensity, persistence, and limiting effects of his symptoms were not credible. R. at 20-21. Accordingly, the ALJ concluded that Hayward was not disabled within the meaning of the Social Security Act. R. at 24.

## II. DISCUSSION

Plaintiff argues that the ALJ's decision is not supported by substantial evidence and is erroneous as a matter of law. Specifically, plaintiff contends that the ALJ improperly assessed plaintiff's RFC by: (1) improperly according great weight to the opinion of Dr. William Amos ("Dr. Amos"), the state agency physician who evaluated Hayward's disability claim on reconsideration on behalf of the Commissioner in late 2010; (2) failing to conduct a proper function-by-function assessment of Hayward's ability to perform work-related activities; (3) improperly discounting the opinions of Hayward's treating physician, Dr. Constantine; and (4) erroneously rejecting the opinion of Ann Davis ("Ms. Davis"), a physical therapist who performed a functional capacity evaluation of Hayward in July 2010. See Mem. Supp. Pl.'s Mot. Summ. J. 6-8, 13.

Conversely, the Commissioner asserts that the ALJ's decision finding that Hayward retained the RFC to perform a limited range of unskilled, light work is supported by substantial evidence. Specifically, the Commissioner argues that: (1) it was appropriate for the ALJ to give

---

activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.
20 C.F.R. § 404.1567(b).

greater weight to Dr. Amos's opinion based on his experience performing social security

disability evaluations,[9] Mem. Supp. Def.'s Mot. Summ. J. ("Def.'s Mot. Summ. J.") 11; (2) the

ALJ need not have described the function-by-function analysis in her decision, Def.'s Opp'n

Pl.'s Mot. Summ. J. 3; (3) the ALJ properly accorded Dr. Constantine's assessments

"significantly less weight" because they were not well supported, Def.'s Mot. Summ. J. 14; and

(4) the ALJ was not obligated to accept Ms. Davis's opinions because, as a physical therapist,

she was not an acceptable medical source, Def.'s Opp'n Pl.'s Mot. Summ. J. 6. The Report

---

[9] If this argument were accepted, the Commissioner would never have to accord any deference to the treating physician. The law does not support this position. The relevant regulation provides that ALJs "are not bound by any findings made by State agency medical . . . consultants." 20 C.F.R. § 404.1527(e)(2)(i). This regulation further elaborates:

> When an [ALJ] considers findings of a State agency medical . . . consultant . . ., the [ALJ] will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section [which apply to the weighing of all medical opinions], such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical . . . consultant provides, and any other factors relevant to the weighing of the opinions. Unless a treating source's opinion is given controlling weight, the [ALJ] must explain in the decision the weight given to the opinions of a State agency medical . . .consultant . . ., as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.

Id. § 404.1527(e)(2)(ii).

In her decision, the ALJ does not discuss any of these factors in relation to Dr. Amos's opinion. Instead, she stated without elaboration that his opinion "is consistent with the medical evidence of record." R. at 22. Further, Dr. Amos provided very little supporting explanations for finding Hayward not disabled. In the section asking him to explain how he weighed the treating source opinion evidence before him, Dr. Amos briefly summarized some of Dr. Constantine's reports and then stated, without elaboration, "This have [sic] all been considered. However, the claimant's condition has changed and improved with time as his condition would do." R. at 84.

Later in the report, Dr. Amos indicated that his findings were less restrictive than Dr. Constantine's opinions regarding Hayward's limitations. R. at 86. Follow-up questions asked him to explain how Dr. Constantine's opinions were more restrictive. R. at 86-87. Rather than explaining why he disregarded Dr. Constantine's descriptions of Hayward's limitations, Dr. Amos inexplicably stated, "Source opinion is an issue reserved to the Commissioner." R. at 86-87. Applying the above factors, the ALJ clearly should not have concluded that Dr. Amos's opinion was entitled to great weight.

rejected each of plaintiff's arguments and found that both the RFC and the ALJ's ultimate decision to deny benefits were supported by substantial evidence. Report and Recommendation 2.

Having reviewed the Report, the administrative record, and the parties' briefs, the Court finds that both the Report and the Commissioner failed to accord appropriate deference to the treating physician's evaluation of plaintiff, mischaracterized plaintiff's function level, and omitted a proper evaluation of plaintiff's report of chronic pain and the effects of the medications needed to control that pain on his ability to engage in sustained employment. The Court additionally finds that the third hypothetical propounded by the ALJ to the vocational expert was inadequate to establish substantial evidence of plaintiff's ability to perform work available in the economy

A. **Standard of Review**

Judicial review of a final decision by the Commissioner "is limited to determining whether the [Commissioner's] findings are supported by substantial evidence and whether the correct law was applied." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002); see also 42 U.S.C. § 405(g). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). It is "more than a mere scintilla but may be somewhat less than a preponderance." English v. Shalala, 10 F.3d 1080, 1084 (4th Cir. 1993). In reviewing for substantial evidence, a court should not "re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the" Commissioner. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (quoting Craig, 76 F.3d at 589). The reviewing court must, however, "take into account whatever in the record fairly

detracts from" the weight of the evidence supporting the agency's conclusion. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

Moreover, "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent exceptional circumstances. Exceptional circumstances include cases where a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." Eldeco, Inc. v. NLRB, 132 F.3d 1007, 1011 (4th Cir. 1997) (internal quotation marks omitted). In those circumstances, the reviewing court is "free to review the record and independently reach its own conclusions." Id. (quoting NLRB v. McCullough Envtl. Servs., Inc., 5 F.3d 923, 928 (5th Cir. 1993)).

Finally, a court should not defer to an ALJ's determination that a claimant's testimony is inconsistent with other evidence about the claimant's activities if "the record, when read as a whole, reveals no inconsistency between the two." Hines v. Barnhart, 453 F.3d 559, 565 (4th Cir. 2006). If the claimant's testimony is not inconsistent with the record as a whole, then the ALJ's determination otherwise is not supported by substantial evidence. See id.

**B. Procedure for determining disability**

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The determination of eligibility for social security benefits requires a five-step inquiry. 20 C.F.R. § 404.1520(a)(4); see also Radford v. Colvin, 734 F.3d 288, 290-91 (4th Cir. 2013) (summarizing the steps). This five-step inquiry asks whether the claimant: (1) is engaged in substantial gainful activity; (2) has a medical impairment (or combination of impairments) that are severe; (3) has a medical impairment that meets or exceeds

11

the severity of one of the impairments listed in Appendix I of 20 C.F.R. Part 404, subpart P; (4) can perform his past relevant work; and (5) can perform other specified types of work. Johnson v. Barnhart, 434 F.3d at 653 n.1 (citing 20 C.F.R. § 404.1520). Before reaching steps four and five, the ALJ must assess the claimant's RFC. See 20 C.F.R. § 404.1520(a)(4)(iv)-(v), 404.1520(e). "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Hines, 453 F.3d at 562 (quoting SSR 96-8p, 1996 WL 374184 (July 2, 1996)) (emphasis added by the Fourth Circuit Court of Appeals in Hines).

The claimant bears the burden of establishing the first four steps. If that burden is met, then at step five the Commissioner bears the burden of "prov[ing] that the claimant, despite her impairments, can perform a 'significant number of jobs in the national economy.'" Johnson v. Barnhart, 434 F.3d at 653 (quoting Walls, 296 F.3d at 290).

### C. ALJ's Assessment of Hayward's RFC

The ALJ determined that Hayward had the RFC "to perform light work as defined in 20 C.F.R. § 404.1567(b) except that due to the combination of [his] obesity and bilateral epicondylitis, he is limited to work requiring no climbing of ropes/ladders/scaffolding on more than an occasional basis, with no more than occasional pushing/pulling with the bilateral upper extremities." R. at 19-20. Based on this RFC, the ALJ concluded that although Hayward is incapable of performing his past relevant work, he is capable of performing other work available in the national economy. R. at 23-24. In reaching her determination of Hayward's RFC, the ALJ considered Hayward's symptoms and the extent to which those symptoms limit his functioning, as well as opinion evidence from Dr. Amos, the state agency physician who

evaluated Hayward's disability claim on reconsideration on behalf of the Commissioner in late 2010; Ms. Davis, the physical therapist who performed a functional capacity evaluation of Hayward in July 2010; and Dr. Constantine, Hayward's treating physician. R. at 20-23.

### 1. Findings Inconsistent with Record Statements

Under Fourth Circuit law, there is a two-step analysis for evaluating the disabling effects of a claimant's pain or other symptoms. See Hines, 453 F.3d at 564-65; Craig, 76 F.3d at 594. First, "there must be objective medical evidence showing the existence of a medical impairment(s) . . . which could reasonably be expected to produce the pain or other symptoms alleged." Id. (internal quotation marks omitted) (explaining that this step requires a threshold showing of a medical impairment that "could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant" (internal quotation marks omitted)). Once the claimant puts forward evidence of an impairment that could cause the pain, the claimant may rely on purely subjective evidence to show that he, in fact, suffers from disabling pain. Hines, 453 F.3d at 564; see also Craig, 76 F.3d at 595 ("[B]ecause pain is subjective and cannot always be confirmed by objective indicia, claims of disabling pain may not be rejected solely because the available objective evidence does not substantiate [the claimant's] statements as to the severity and persistence of her pain. . . . [T]he claimant's allegations as to the severity and persistence of her pain may not be dismissed merely because objective evidence of the pain itself . . ., such as inflamed tissues or spasming muscles, are not present to corroborate the existence of pain." (internal quotation marks and citations omitted)).

Here, the ALJ first found that Hayward's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." R. at 20. At the second step, however, the ALJ found that Hayward's "testimony as to the extent of limitation derived from [his]

impairments is not fully credible in light of his reported daily activities and the inconsistencies in his record statements." R. at 21.

Specifically, the ALJ stated:

> Although the claimant indicated that limiting pain has been ongoing since his injury in 2007, such statements in 2010 indicate the continuation of many activities far past the alleged injury date. His self-professed activities include bathing, dressing, driving, cooking complete meals on a daily basis, shopping a few times weekly, shooting guns, riding all terrain vehicles (ATVs), and household chores such as cleaning, laundry and mowing the lawn (Exhibits 2E/4E/5E/8E/9E/12E/13E/15E). Indeed, the claimant indicated that a typical day includes tending to his personal hygiene, feeding/watering his dogs, doing household chores such as washing dishes, watching television, visiting with friends, and helping to cook dinner (Exhibit 4E).[10]

R. at 21-22. This brief characterization ignores Hayward's further relevant statements qualifying how he performs these activities and describing changes to his habits caused by his injuries. Cf. Hines, 453 F.3d at 565-66 (rejecting ALJ's glib characterization of tasks claimant was capable of performing when the ALJ selectively cited only to evidence that supported the ALJ's characterization). For example, Hayward consistently stated that if he performs household chores, he must take breaks to rest his arms and he can only perform chores for a short time until the pain becomes too severe. R. at 49, 205, 207, 208, 212, 227. In contrast to the ALJ's statement that Hayward mowed his lawn, he consistently stated that his wife had taken over the chore of mowing the lawn because it was too painful for him to do so. R. at 207, 212, 228. As to cooking, although Hayward reported in his March 2010 function report that the types of food he prepares are "sandwiches, frozen dinners and complete meals," which he prepared daily, he also reported that the "majority of the time" he and his wife do it together. R. at 207. A fair reading of these statements does not yield the ALJ's simple characterization that Hayward cooks

---

[10] The ALJ did not cite precise support for her summary of plaintiff's "self-professed activities." The exhibits she cites are dated from February 2010 to December 2011 and range in length from three to twelve pages.

"complete meals on a daily basis," impliedly without aid. Moreover, Hayward's later statements in 2010 through the hearing in 2012 demonstrate that he had resorted mainly to making sandwiches. R. at 49, 227, 244-45. Additionally, rather than stating merely that he shops a few times weekly, Hayward actually stated that when he goes grocery shopping, he goes with his wife because he cannot push the shopping cart or carry most of the bags. R. at 208, 244, 252. The ALJ's above assertion that "a typical day for Hayward includes . . . visiting with friends" is equally misleading. Instead, in response to the prompt "[d]escribe what you do from the time you wake up until going to bed," Hayward stated, among other things, that he "talk[s] to friends in person or on [the] phone." R. at 205. Talking on the phone is hardly the same as visiting with friends every day. Further, although the ALJ accurately wrote that Hayward reported feeding his dogs regularly, he also reported that he is no longer able to walk them due to the pain in his wrist and elbows. R. at 205-06, 209, 226, 244. Being able to scoop dog food into a bowl once or twice per day does not contradict Hayward's self-described functional limitations for his arms. Finally, his self-reported activities during the length of time cited by the ALJ did not include shooting guns and riding ATVs. Rather, Hayward's March 2010 function report was unclear as to whether he could still perform such activities.[11] His December 2010 function report and his

_____

[11] The following is an excerpt from Hayward's March 2010 function report:
Q: "What are your hobbies and interests?"
A: "[R]iding ATVs, camping, hunting, shooting . . . ."
Q: "How often and how well do you do these things?"
A: "[C]an shoot[,] ride ATVs on hard trails . . . ."
Q: "Describe any changes in these activities since the . . . injuries . . . began."
A: "[C]an't go/instruct at shooting range, can't be a Deputy . . . ."
R. at 209. Later in this report, however, Hayward states, "I loved the outdoors camping hunting ATV riding shooting hiking ect. [sic] That part of my life is over." R. at 212. Taken together, these statements do not unequivocally relate that Hayward was able to shoot or ride ATVs at that time; at worst, they are ambiguous. A fairer reading reflects that he interpreted the questions regarding his hobbies as asking him what his hobbies have been historically, not what hobbies he had the ability to perform at the time he filled out the report.

testimony before the ALJ clarified that his injuries prevented him from both shooting and ATV riding. R. at 55, 226, 229. In sum, the ALJ's summary of Hayward's self-professed activities is not a fair characterization and is not, therefore, supported by substantial evidence.

The ALJ further found that "Hayward's credibility is . . . undermined by inconsistencies within his statements demonstrating widely unrestricted activities within his March 2010 statement (Exhibit 4E) but the inability to perform nearly any activities in his December 2010 statement, despite the fact that the objective medical evidence does not support such a severe decline in limitation." R. at 22 (citing the March 29, 2010, and December 30, 2010, function reports). This statement is unsupported in two respects.

First, the objective medical evidence does support a decline in limitation, as Hayward's right elbow is documented as worsening during this time frame. An MRI of his right elbow on September 20, 2010, revealed "moderate to severe lateral epicondylitis [with] actually high-grade partial tearing of the lateral epicondylar insertion of the ECRB tendon." R. at 492. To relieve the pain caused by this tear, Hayward received two injections in his right elbow, one in October and one in November of 2010. R. at 492, 571. Dr. Constantine used "a little extra juice" in the second injection because the first injection only provided minimal pain relief. R. at 571. Additionally, Dr. Constantine observed that while the left elbow was improving post-surgery, his "right one seem[ed] to be worsening." R. at 571.

Second, the ALJ's assertion that Hayward's statements in March 2010 demonstrated his ability to engage in "widely unrestricted activities" but that his statements in December 2010 demonstrated "the inability to perform nearly any activities" is factually inaccurate. Hayward's March 2010 description of his activities only seems "widely unrestricted" when characterized and summarized as the ALJ did, omitting all relevant limitations described by Hayward. Instead,

16

if Hayward's March 2010 statements were fairly treated, the decline in functional ability from March to December would not appear as dramatic as the ALJ describes. Moreover, the additional limitations in the December report were consistent with the decline in his right elbow.

This Court is mindful of the admonition that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent exceptional circumstances." Eldeco, 132 F.3d at 1011 (internal quotation marks omitted). But the record, when read as a whole, reveals no significant inconsistencies between the answers Hayward provided in the function reports, in the daily activities questionnaires, and during the hearing.[12] See Hines, 453 F.3d at 565. Rather, the ALJ described Hayward's activities in a way that significantly ignored Hayward's pain, the side effects of the pain medications, and the difficulty that he experiences as a result of that pain and those medications.

Accordingly, the Court finds the ALJ's determination that Hayward's claims of pain and accompanying limitations lacked credibility is not supported by substantial evidence.

### 2. Weight Given to Treating Physician's Opinions

Plaintiff also contests the ALJ's decision to give "little weight" to Dr. Constantine's evaluations limiting Hayward "to activities involving lifting of no more than five to ten pounds with the left arm, maximal lifting of twenty pounds with the right arm, and no repetitive bilateral elbow/arm use." R. at 23, 488, 510, 511, 611. The ALJ gave little weight to Dr. Constantine's opinions because "his opinions are not entirely consistent with the records in this case, including his own treatment notes . . . demonstrating multiple periods of only mild symptomatology." R. at 23.

---

[12] The Court recognizes that there are minor inconsistencies in Hayward's description of his abilities over time, but they do not amount to substantial evidence in support of the ALJ's unfair characterizations and ultimate credibility determination.

An ALJ is required to evaluate and weigh medical opinions based on several non-exhaustive factors: "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." Hines, 453 F.3d at 563 (quoting Johnson, 434 F.3d at 654). Courts ordinarily "accord greater weight to the testimony of a treating physician because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." Id. (quoting Johnson, 434 F.3d at 654). An ALJ may, however, "choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence." Id. at 563, n.2 (quoting Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).

Here, the ALJ stated, without explanation, that Dr. Constantine's opinions were "not entirely consistent" with the record. In reaching this conclusion, the ALJ did not cite to any inconsistencies between Dr. Constantine's evaluations and the other medical records in this case or between his own treatment notes. Moreover, the record does not appear to contain any such inconsistencies between Dr. Constantine's treatment notes and his description of Hayward's limitations. Although Dr. Constantine often described Hayward's condition as presenting "mild" or "moderate" pain in the elbows and right wrist, he also consistently stated that the pain was chronic, that it worsened anytime Hayward overused either arm, and that Hayward needed to avoid repetitive bilateral arm movements to prevent re-injury of his elbows. R. at 488, 510, 511, 574, 611. Dr. Constantine also never questioned Hayward's need to continue with the pain medication regimen prescribed by Hayward's pain specialist, which included two different Schedule II narcotics and which Hayward was still receiving at the time of the 2012 hearing. R. at 47, 305, 324, 575, 616. Indeed, Hayward testified that he was even beginning a third narcotic

pain medication the day of the hearing. R. at 47. The ALJ also failed to cite to any persuasive evidence contrary to the opinions of Dr. Constantine. Therefore, the ALJ's decision to attribute little weight to Dr. Constantine's consistent opinions restricting Hayward from lifting heavier weights and from performing repetitive bilateral elbow and arm activities is not supported by substantial evidence.

### 3. Weight Given to the Physical Therapist's Opinion

Hayward next contends that the ALJ improperly rejected the opinions of Ms. Davis because, as a physical therapist, she was not an "acceptable medical source." The only evidence from Ms. Davis was her functional capacity evaluation of Hayward performed on July 21, 2010. In her report, Ms. Davis found that Hayward could not return to work as a deputy sheriff but that he did have an ability for employment at a light duty level. R. at 540. She also found that "his bilateral epicondylitis limits his work ability in regard to the amount of time he can perform any movement at the wrist and elbow." R. at 540. This finding was consistent with Dr. Constantine's instructions that Hayward should not do any repetitive bilateral elbow movements. Ms. Davis's evaluation also indicated that he "is limited due to his complaints of pain with any type of lifting, carrying and gripping with the right hand" and that he "has pain in the right wrist with manipulating objects" overhead or out in front of him. R. at 541. Finally, she found that Hayward could comfortably lift 40 pounds below the waist on an occasional basis, 35 pounds above the waist, and 20 pounds overhead. R. at 541.

Social Security Ruling 06-03p states, "In addition to evidence from 'acceptable medical sources,' we may use evidence from 'other sources,' as defined in 20 C.F.R. § 404.1513(d) and 416.913(d), to show the severity of the individual's impairment(s) and how it affects the individual's ability to function. These sources include . . . therapists . . . ." SSR 06-03p, 2006

19

WL 2329939 (Aug. 9, 2006). This ruling makes clear that the ALJ has discretion to consider evidence from such other sources in evaluating the severity of an impairment. In this case, Ms. Davis's opinion suffers the same weakness as that of Dr. Amos—it is based on the state of Hayward's impairments almost a year and half before the hearing, thereby failing to provide the ALJ with a complete picture of Hayward's functional capacity. Only the records from Dr. Constantine documented Hayward's medical condition and functional ability through December 2011. As explained in more detail below, much changed regarding Hayward's condition and ability between mid-2010 and the hearing in January 2012. Accordingly, the ALJ was correct to accord little weight to Ms. Davis's opinion in the context of the record as a whole.

### 4. Weight Given to State Agency Physician's Opinion

Lastly, plaintiff argues that the ALJ improperly accorded too much weight to Dr. Amos, the agency doctor who reviewed Hayward's claim during the reconsideration process and concluded, based solely on a review of the record, that Hayward retained the RFC to perform a limited range of light work. In assessing Hayward's RFC, the ALJ gave "great weight to the opinion of the State agency consultant on reconsideration, as it is consistent with the medical evidence of record, including that submitted at the hearing level." R. at 22.

Without explaining how Dr. Amos's opinion was consistent with the other record evidence, including Dr. Constantine's recommendation as to limitations on repetitive bilateral movements and Ms. Davis's opinion, the ALJ wholly adopted Dr. Amos's RFC for Hayward. R. at 19-20, 22. In doing so, the ALJ failed to adequately explain why she found Dr. Amos's RFC assessment so persuasive in March 2012 when his assessment only considered evidence up to October 25, 2010. R. at 82-83. Even Dr. Amos acknowledged that his opinion was based upon his understanding that Hayward's "condition has changed and improved with time," R. at 84;

however, the unambiguous evidence in the record demonstrates that Hayward's condition had not improved with time. To the contrary, the record shows that Hayward's right elbow continued to worsen in late 2010, requiring another, stronger injection for the pain in November 2010. R. at 571. Thereafter, Hayward's left elbow flared up again, and an MRI scan on March 10, 2011, showed "chronic tendinopathy and lateral epicondylitis" in that elbow. R. at 574, 600. To address these problems, Hayward underwent a revision left lateral epicondylar release with stripping and a left anconeus muscle transfer on April 29, 2011. R. at 587-88. Throughout this period, Hayward's right elbow and wrist continued to worsen, and Dr. Constantine strongly recommended, throughout the latter half of 2011, a lateral epicondylar release with an anconeus muscle transfer for his right elbow and an ulnar shortening osteotomy for his right wrist. R. at 56-57, 612, 617, 629.

In her decision, the ALJ inaccurately addressed all of these subsequent problems by stating that Hayward's left elbow again improved following the second surgery and that his right extremity was declared to be at maximum medical improvement by December 2011 despite Hayward not having undergone either recommended surgery.[13] R. at 21. Although the record shows that Hayward's left elbow did improve following the second surgery, the record also reflects that the elbow did not return to normal and continued to be partially impaired. R. at 612, 615, 617, 618. Moreover, in his December 8, 2011, status report, Dr. Constantine makes clear that he has only declared Hayward's right arm to be at maximum medical improvement because Worker's Compensation would not approve the surgeries, without which Hayward's right wrist

---

[13] The only evidence in the record explaining why Hayward did not undergo those two surgeries is a comment from Dr. Constantine that Worker's Compensation would not pay for it. R. at 629.

and elbow would not improve.[14] R. at 629. For these reasons, the ALJ's determination that Dr. Amos's opinion was entitled to "great weight" is not supported by substantial evidence.

### 5. Hypotheticals Posed to Vocational Expert

Following Hayward's testimony at the hearing, the ALJ asked Ms. Verser, the vocational expert, three hypothetical questions to determine whether jobs exist in the national economy for an individual with Hayward's age, education, work experience, and residual functional capacity. R. at 24. Each hypothetical assumed a different residual functional capacity.

For the first hypothetical question, the ALJ asked Ms. Verser to "assume that I find the claimant's testimony credible and that the individual ha[d] the limitations the claimant described including the inability to lift more than a gallon of milk or eight pounds, [and] the need to lie down twice daily for an hour each time." R. at 63. The ALJ further asked Ms. Verser to assume that the individual had "a moderately severe limitation in the ability to attend and concentrate or even remember short, simple instructions for a minimum of four hours during the day, the inability to use the right dominant hand for even occasional fingering, feeling, and the inability to use the . . . left non-dominant hand . . . for feeling." R. at 63-64. Given these limitations, the

---

[14] Specifically, Dr. Constantine's December 8, 2011, report provides:
  [Hayward] is still having issues with his right lateral epicondylitis and the right ulnar-sided wrist pain. I declared him at maximum medical improvement because Workers [sic] Compensation had not approved an ulnar shortening osteotomy for his right wrist, but he is really reconsidering because he has just continued to have pain and would like to get more function.
R. at 629. Dr. Constantine went on to say:
  [Hayward] definitely needs [the osteotomy] to give him the best chance of decompressing the ulnar side of the wrist and giving [sic] him a chance of improvement that he has not had for several years. In addition he still needs a lateral epicondylar release, and because of the issues with his left elbow, I would do the muscle transfer simultaneously.
R. at 629.

vocational expert testified that the hypothetical individual would not be able to perform Hayward's past work or any other work available in the local or national economy. R. at 64.

For the second hypothetical question, the ALJ asked Ms. Verser to assume that an individual were limited to lifting zero to ten pounds, were otherwise limited to sedentary work as defined in the regulations, and were restricted from performing repetitive bilateral elbow arm activities. R. at 64-65. Given these limitations, the vocational expert testified that the individual would not be capable of performing Hayward's past work or any other work in the local or national economy. R. at 65.

For the final question, the ALJ explicitly premised the hypothetical limitations on the functional capacity evaluation performed by Dr. Amos. R. at 66 ("I'm going to read to Ms. [Verser] the limitations that are set forth in 4A which is the DDS opinion."). These limitations were as follows:

> The individual is occasionally able to lift and/or carry[,] including upward pulling[,] 20 pounds and frequently lift and/or carry[,] including upward pulling[,] 10 pounds[;] the individual is able to stand and/or walk with normal breaks for about six hours in an eight hour work day and sit with normal breaks for a total of more than six hours on a sustained basis in an eight hour work day[;] the individual is limited to occasional pushing and pulling with both upper extremities[; and] the individual is able to occasionally climb ladders, ropes or scaffolds . . . .

R. at 66. Given these limitations, the vocational expert testified that the individual would not be able to perform Hayward's past work, but he would be able to perform other work in the local or national economy, namely, usher, sandwich board carrier, and parking lot attendant. R. at 66-67. In her final decision, the ALJ adopted the third hypothetical, which is the only one of the three to result in a finding that Hayward is capable of performing work. R. at 24.

"[I]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper

hypothetical questions which fairly set out all of claimant's impairments." Hines, 453 F.3d at

566 (quoting Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989)). In this case, the third

hypothetical only included the limitations from Dr. Amos's report, which was limited to

evidence ending in 2010; therefore, Ms. Verser's opinion regarding this hypothetical was not

"based upon a consideration of all other evidence in the record." Additionally, this hypothetical

did not "fairly set out" Hayward's inability to perform repetitive bilateral arm movements, his

chronic pain, and the effect of his medications; and Dr. Amos did not explain in his evaluation

why those impairments were not included in his assessment of Hayward's RFC. Therefore, the

ALJ's reliance on the third hypothetical is not supported by substantial evidence.

### D. Resolution

Having found that the ALJ's conclusion is not supported by substantial evidence, the

issue remains of how to resolve the matter. Plaintiff requests that this Court reverse the

Commissioner's decision and award him disability benefits or, alternatively, remand to the

Commissioner for a new hearing. Compl. 2. A reviewing court is authorized to affirm, modify,

or reverse a decision of the Commissioner "with or without remanding the cause for a

rehearing." 42 U.S.C. § 405. Under this statute, it is "appropriate to reverse without remanding

where the record does not contain substantial evidence to support a decision denying coverage

under the correct legal standard and when reopening the record for more evidence would serve

no purpose." Breeden v. Weinberger, 493 F.2d 1002, 1012 (4th Cir. 1974).

In this case, the ALJ determined Hayward's RFC largely based on the ALJ's credibility

assessment and Dr. Amos's evaluation of Hayward's claim, neither of which was supported by

substantial evidence, as explained above. Hayward's credibility as to the degree of pain and the

extent of limitation derived from his impairments is not sufficiently clear, however, to justify an

immediate award of appropriate benefits. Accordingly, the decision of non-disability will be vacated and remanded to the ALJ, who will be directed to reassess Hayward's credibility based on an accurate assessment of his description of his activities. The ALJ should also reassess Hayward's RFC in light of any new credibility determination. In particular, the ALJ should consider Hayward's record statements regarding his inability to manipulate small objects, the pain he experiences from repetitive movements, and his need to take rest breaks when performing tasks with his arms. The ALJ should also obtain a current RFC evaluation and consider the impact of the medications Hayward takes daily on his ability to work an eight-hour day.[15] If necessary, the ALJ may hold another evidentiary hearing to ask a vocational expert a series of hypothetical questions premised on a more accurate assessment of Hayward's RFC.

### III.   CONCLUSION

For the reasons stated in this Memorandum Opinion, plaintiff's motion for summary judgment [Dkt. No. 11] will be granted, defendant's motion for summary judgment [dkt. no. 13] will be denied, and the Commissioner's denial of benefits will be vacated and remanded for further fact-finding by an appropriate order to be issued with this Memorandum Opinion.

Entered this 26 day of November, 2014.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

---

[15] The ALJ also needs to correct her inaccurate description of plaintiff's pay status post-2009, as discussed in footnote 3.